**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ELIZABETH FAYE STEELE,** | : | |
| | : | |
| **Plaintiff/** | : | **Case No. 2:16-cv-61** |
| **Counter-Defendant,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **MENARDS HOME IMPROVEMENT,** | : | |
| | : | |
| **Defendant/** | : | |
| **Counter-Claimant.** | : | |

**OPINION & ORDER**

This matter comes before the Court on Menard, Inc.'s ("Menards") Motion for Summary Judgment on Elizabeth Steele's negligence claim and Menards's counterclaim for breach of contract. (Doc. 13).[1] As explained below, the Court will **GRANT** Menards's Motion for Summary Judgment because the parties have an enforceable settlement agreement that Steele breached by filing this lawsuit. Menards, however, must tender Steele the $2,500 she is owed under that settlement agreement.

**I. BACKGROUND**

In January 2014, Steele was shopping for an electric heater at the Menards store at Easton Town Center. Steele asked a Menards employee to retrieve the heater from a shelf high above the ground. To do so, the employee climbed a ladder approximately fifty to twenty feet tall, removed the heater from the shelf, but then dropped it as he was descending the ladder. The fifty to sixty-five pound box fell from the top of the ladder onto Steele's face, causing a cervical sprain in her neck and a minor concussion. Steele was prescribed Flexeril, a muscle relaxant, for her injuries.

---

[1] The case caption erroneously refers to Menard, Inc. as "Menards Home Improvement."

On July 15, 2014, Steele entered into a "Full and Final Release of Non-Litigated Claim" ("Release") with Menards to resolve any claims arising from the injuries sustained during her shopping trip.  (Ex. 1 to Affidavit of Michael Hanna (Ex. A. to Def.'s Mot. for Summ. J.) ("Hanna Aff.")).  By signing and executing the Release, Steele agreed to perform or forego the following actions:

- [R]elease, acquit and forever discharge . . . [Menards] . . . from *any and all rights, claims, causes of action, actions, demands and damages of any kind*, known or unknown, existing or arising in the future, resulting from or related to personal injuries, emotional distress, loss of use, loss of income, impairment to earning capacity or any other damage or expense *incurred or sustained as a result of, or in any way related to, an accident that occurred on January 7, 2014, in Franklin County, OH at Menards in Columbus OH* [in exchange for a sum of $4000.00].  (*Id.* ¶ 1 (emphasis added)); and

- [I]ndemnify and hold harmless [Menards] from any and all actions, claims, liens, or demands of any nature that are filed or will be filed against [Menards] that arise out of these alleged damages to myself, my heirs, assigns, agents or insurers, resulting or claimed to have resulted from the accident . . . . [and] pay any costs, expenses, and attorney fees incurred in the defense of such action.  (*Id.* ¶ 5).

Steele's execution of the Release also indicated the following: (1) she understood that the $4,000 she would receive in exchange for the Release was "not only for the injuries and damages that are now or in the future claimed to have resulted from the [January 7, 2014] incident," but also was "to avoid the uncertainty and expense in the commencement and/or delay of continuing litigation" (*id.* ¶ 4); (2) if she was represented by an attorney, she had discussed the settlement with her attorney and executed the Release in conformity with any legal advice she received (*id.* ¶ 11); (3) she understood and agreed that the $4,000 was "fair and equitable under all circumstances" and that it was all the money or consideration she would receive from Menards relating to her accident (*see id.*); and (4) she had "read [the] Release, unders[tood] its terms, and [signed] it knowingly and by act of free will" (*id.* ¶ 13).

2

When she entered into the Release with Menards, Steele was represented by an attorney, Louis Jay Chodosh.  According to Chodosh, he and Steele discussed the terms of the Release before she signed and executed it.  Although at first she "was not pleased with the settlement," she later came around after Chodosh "explained the reasons for the amount and the process for filing suit if she did not accept [it]."  (Ex. B. to Def.'s Mot. for Summ. J., Affidavit of Louis Jay Chodosh ("Chodosh Aff.") ¶ 1).  After she signed and executed the Release, Menards sent Steele two checks totaling $4,000—one for her attorneys' fees (for $1,500), payable directly to Chodosh's law firm, and another (for $2,500) made payable to Steele.

Chodosh's law firm cashed and deposited its check for attorneys' fees.  Steele, however, did not cash her settlement check; instead, Steele alleges that she called Chodosh shortly after signing the Release and told him that she had changed her mind about settling.  According to Steele, she talked to her parents that same day and then directed Chodosh *not* to return the signed and executed Release to Menards.  Chodosh does not mention any phone call the day that Steele signed the Release, but he acknowledges that he later returned Steele's check to Menards at her direction.

Steele maintains that, when she signed the Release, she was "very anxious, not clear in [her] thoughts, and unable to properly comprehend what was going on," which she attributes to the Flexeril.  (Affidavit of Elizabeth Faye Steele ("Steele Aff.") at 1).  According to Steele, the Flexeril made her feel "drowsy . . . . loopy[,] and incoherent."  (*Id.*)  Steele claims her anxiety was compounded by the fact that she was grieving the death of her husband, which occurred nine months earlier.  (*See id.*).  While Chodosh acknowledges that Steele was having "emotional issues, at the time," he believes that Steele understood the consequences of entering into the Release.  (Chodosh Aff. ¶ 2).

Steele contends that, after she stopped taking the Flexeril, she "was able to think more clearly" and retained a new attorney to pursue a lawsuit against Menards. (Steele Aff. at 2). In January 2016, Steele filed a complaint against Menards in the Franklin County Court of Common Pleas, alleging negligence. Menards removed the lawsuit to this Court (Doc. 1), and brought a counterclaim against Steele for her alleged breach of the Release. (Doc. 4). Menards now moves for summary judgment on Steele's negligence claim and its counterclaim for breach of contract. (Doc. 13). The matter is fully briefed and ripe for review.

## II.  STANDARD OF REVIEW

Menards moved for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proof on both points. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). In determining whether this standard is met, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013). As always, this inquiry turns on "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The mere existence of a scintilla of evidence does not suffice to survive a motion for summary judgment; rather, there must be evidence on which a jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## III.  ANALYSIS

As both parties agree, this case hinges on whether the July 2014 Release between Steele and Menards constitutes an enforceable contract.  If so, then the contract governs, thus barring Steele's underlying suit for negligence.  If not, then Steele's suit may proceed.

### A.  Ohio Law Governs this Contract Dispute.

This is a diversity case, and, as the parties' briefing implicitly agrees, Ohio law governs. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).  As such, the Court looks to "the decisions of the state's highest court when that court has addressed the relevant issue." *Id.* (quotation omitted).  If the issue has not been directly addressed, the Court must anticipate how Ohio's Supreme Court would rule in the case and may look to decisions from the Ohio Courts of Appeals in making that assessment. *Id.*

### B.  Menards Has Shown a Breach of Contract.

To establish a breach of contract in Ohio, a claimant must establish "the existence of a contract, performance by the [claimant], breach by the [opposing party], and damage or loss to the [claimant]." *Savedoff*, 524 F.3d at 762 (quotation omitted).  As the Supreme Court of Ohio has explained, "[i]t is axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation and that such agreements are valid and enforceable by either party." *Continental W. Condominium Unit Owners Ass'n v. Howard E. Ferguson, Inc.*, 74 Ohio St. 3d 501, 502 (1996).  Indeed, Ohio courts "highly favor" settlement agreements. *Id.* Once the parties reach a settlement agreement, it becomes binding and cannot be repudiated by either party. *Klever v. City of Stow*, 13 Ohio App. 3d 1, 4 (1983) (collecting cases).  As explained below, Menards has satisfied all elements of its breach-of-contract counterclaim beyond dispute and is entitled to judgment as a matter of law.

<u>1.  Steele and Menards Entered an Enforceable Contract.</u>

Steele does not contest elements two through four of Menards's breach-of-contract counterclaim.  Instead, Steele argues that Menards's claim fails, and her own suit may proceed, because the parties did not have an enforceable contract.  Steele suggests that the Release fails as an enforceable contract for three reasons: (1) she lacked the mental capacity to enter a contract; (2) she instructed her attorney not to send the Release to Menards after she signed and executed it; and (3) she refused to cash Menards's settlement check.  (*Id.*).  As explained below, each of Steele's arguments lacks merit.

<u>a.  The Release is Enforceable Despite Steele's Alleged Incapacity from Pain Medication.</u>

Ohio courts recognize that "a party seeking to void a contract because of lack of mental capacity has the burden of proof by clear and convincing evidence."  *Giurbino v. Giurbino*, 89 Ohio App. 3d 646, 658 (1993) (collecting cases).  The test for mental capacity to contract "is whether the person claimed to be incompetent understood the nature of the transaction and the effects of his or her own actions."  *Id.*

Steele cannot withstand summary judgment under this test because her threadbare statements regarding the effects that her pain medication had on her capacity to enter a contract fail to rise above a mere "scintilla of evidence."  *See Copeland*, 57 F.3d at 479.  For example, in *Berman v. Kafka*, the Eleventh Circuit affirmed enforcement of a settlement agreement where one party sought to void it on the grounds that "he was on pain medication that reduced his capacity to agree to a settlement."  518 F. App'x 783, 784-86 (11th Cir. 2013) (per curiam). In so doing, the court relied heavily on the law of the forum state (Florida) which, like Ohio, "favor[s] settlement agreements and will enforce them when it is possible to do so."  *Id.* at 785. And, in a similar nod to Florida (and Ohio) law, the Eleventh Circuit noted as follows:

> As to capacity . . . mere weakness of mind, unaccompanied by any other inequitable incident, if the person has sufficient intelligence to understand the nature of the transaction and is left to act upon his own free will, is not a sufficient ground to set aside an agreement.

*Id.* (quotation omitted); *see also Feathers v. Tasker*, No. 26318, 2012-Ohio-4917, at ¶ 11 (9th Dist. Ct. App.) ("[A] party's change of heart regarding the terms of a settlement agreement does not constitute grounds to set aside the agreement."); *DiPietro v. DiPietro*, 10 Ohio App. 3d 44, 49 (1983) ("A state of depression is not equivalent to mental incompetency.").

Likewise, in *Lopez v. Kempthorne*, a Texas district court enforced a settlement agreement where one party submitted "her own, self-serving affidavit . . . arguing that she . . . remained ill from a tension headache the whole week in which the mediation and settlement took place." No. H-07-1534, 2010 WL 4639046, at *1, *4 (S.D. Tex. Nov. 5, 2010).  There, as here, the party opposing the settlement agreement was represented by an attorney; claimed that she "was given a prescription" for her illness and "continued to suffer from pain, anxiety, and disorientation" during settlement negotiations; and supported her argument solely through a self-serving affidavit, all in the face of the signed, executed agreement itself. *Id.* at *1, *4.  The court rejected her argument because she failed to support it with "independent admissible evidence." *Id.*  Instead, the court held that when "a party knowingly and voluntarily enters into a settlement, the agreement will not be voided because that party changes his mind later." *Id.*

So too here.  The parties' briefing and supporting materials, including *Steele's* own affidavit, show that she was represented by an attorney throughout her settlement negotiations with Menards and that she freely discussed the terms of the Release with her attorney before signing and executing it.  (Steele Aff. at 1; Chodosh Aff. ¶ 1-2).  Indeed, Menards's supporting materials show that Steele consciously weighed her options with her attorney before signing the Release.  (Chodosh Aff. ¶ 1).

The parties' briefing and supporting materials likewise show that Steele understood the nature of the transaction.  In fact, Steele discussed the terms of the settlement with her attorney, signed the Release, and then further debated the terms of the Release with her parents *that same day*, all before calling her attorney that very afternoon to purportedly call off the settlement agreement.  (Steele Aff. at 1).  Thus, her affidavit is not only unsupported, it also seems internally "inconsistent."  *See Lopez*, 2010 WL 4639046, at *4.  Steele understood the nature of her transaction all too well—she simply disliked the result and tried to unravel it.

Finally, the parties' briefing and supporting materials reveal that Steele understood the effects of her own actions.  If Steele were confused or unaware that she had settled her claim with Menards by signing and executing the Release, then why would she call her attorney the very same day in an effort to unravel the agreement?  To the contrary, Steele's affidavit shows that she knew exactly what she was doing both when she signed the Release *and* when she later thought better of it after talking with her parents.  But having a "change of heart regarding the terms of a settlement agreement does not constitute grounds to set aside the agreement." *Feathers*, 2012-Ohio-4917, at ¶ 11.

In sum, Steele has failed to create a genuine dispute of material fact as to whether the Release is unenforceable due to her alleged incapacity.  She knowingly and voluntarily signed an agreement which stated that she: (1) had discussed the settlement with her attorney and executed the Release in conformity with any legal advice she received (Ex. 1 to Hanna Aff. ¶ 11); (2) agreed that the $4,000 settlement was "fair and equitable under all circumstances" (*id.*); and (3) acknowledged that she had "read [the] Release, unders[tood] its terms, and [signed] it knowingly and by act of free will" (*id.* ¶ 13).  Moreover, both her attorney and a notary public witnessed her signing the Release, but neither questioned her capacity to do so.  (*Id.*).

8

If parties could withstand summary judgment on breach-of-contract claims any time they submitted a thread-bare affidavit suggesting they were "drowsy" or "loopy" from taking prescription medications, contracts "would tumble like pins on a bowling alley." *Cf. DiPietro*, 10 Ohio App. 3d at 49. That cannot be the case, especially when applying Ohio law, which "highly favor[s]" settlement agreements as a way to terminate claims and efficiently administer the resolution of cases. *See Continental W. Condominium*, 74 Ohio St. 3d at 502. As such, the Court finds that Steele was competent to form an enforceable contract, and that she did so by signing and executing the June 2014 Release.

### b. The Release is Enforceable Despite Steele's Instruction to her Attorney not to Mail it to Menards.

Steele next argues that the Release is unenforceable because she allegedly instructed her attorney not to mail the signed and executed Release to Menards the day the agreement was finalized. Even crediting Steele's version of events, this argument is a non-starter because under Ohio law, there is no general rule "that requires a contract to be physically delivered before it is binding on the parties without an agreement to the contrary." *Indus. Heat Treating Co. v. Indus. Heat Treating Co.*, 104 Ohio App. 3d 499, 509 (1995). In other words, the offeror of a contract controls the form of acceptance. *Id.* (citing 1 Williston on Contracts, Section 76). Here, the offeror (Menards) explicitly stated in the Release that it "will become effective on the date of execution,"—and that "no rescission or revocation periods [were] required by governing law." (Ex. 1 to Hanna Aff. ¶ 12). These terms are unambiguous, so the Court must enforce them accordingly. *Indus. Heat*, 104 Ohio App. 3d at 509 ("In this case, it is undisputed that delivery as a condition precedent was not mentioned in either document and that if the release and agreement are valid without physical delivery their effect is to completely bar appellant's claims against appellee.").

9

Because the Release stated that it would become effective "on the date of execution" rather than upon delivery, Steele's second argument lacks merit.  The signed and executed Release is not void due to Steele's instruction to her attorney not to mail the agreement to Menards.  *See, e.g.*, *Wallace v. Kalniz, Choksey Dental-Ralston, Inc.*, No. WD-12-048, 2013-Ohio-2944, at ¶ 25 (6th Dist. Ct. App.) ("In the absence of an agreement to the contrary, there is no general rule in Ohio that requires a contract to be physically delivered before it is binding."); *Waddell v. Frasure*, No. 05CA3040, 2006-Ohio-6093, at ¶ 16 (4th Dist. Ct. App.) ("Absent an agreement by the parties to the contrary, a contract need not be physically delivered before it is binding on the parties.").

### c.  The Release is Enforceable Despite Steele's Refusal to Cash her Settlement Check.

Finally, Steele argues that the Release is unenforceable because she refused to cash her settlement check from Menards and, instead, directed her attorney to return it to the company.  Here again, Steele is wrong and cites no case law in support.

Under Ohio law, once the parties reach an agreement to settle, the agreement becomes a contract that cannot be repudiated by either party.  *See Klever*, 13 Ohio App. 3d at 4 ("[W]hen the parties agree to a settlement offer, this agreement cannot be repudiated by either party . . . ."); *Stanton v. Holler*, No. 07 BE 29, 2008-Ohio-6208, at ¶¶ 14-21 (7th Dist. Ct. App.) (refusing to allow one party to repudiate a settlement agreement merely because repudiation seemed more favorable upon further review).  The law in Ohio is clear: "one party to a settlement agreement cannot subsequently unilaterally reject the agreement."  *Bethke v. Airport Mini Storage*, No. 85217, 2005-Ohio-3589, at ¶ 15 (8th Dist. Ct. App.).  To hold otherwise, and "[t]o permit a party to unilaterally repudiate a settlement agreement[,] would render the entire settlement proceedings a nullity, even though the agreement is of binding force."  *Id.*

The fact that Steele changed her mind after speaking with her parents and later declined to cash the settlement check that Mendards tendered to her simply is not relevant to the enforceability of the Release. *See id.* at ¶¶ 16-17 (finding a meeting of the minds and enforcing settlement agreement where "the necessary documents, including the release[,] [were] completed *and the settlement check was prepared.*" (emphasis added)); *see also Gray v. Dep't of Defense*, 91 F. App'x 137, 140 (Fed. Cir. 2004) (holding that plaintiff could not "negate" settlement agreement by "return[ing] the money paid to him under the agreement").

<u>2.  Menards Performed Under the Release.</u>

Menards performed its obligation to pay Steele $4,000 to settle all claims from her January 2014 accident.  (Hanna Aff. at ¶¶ 6-8).  Menards performed this obligation by sending Steele two checks: one for her lawyer (for attorneys' fees) and the other to Steele herself.  (*Id.*). Menards had no other obligations under the Release.  (*Id.* at ¶ 6; Ex. 1 to Hanna Aff. at ¶ 1). Steele does not contest Menards's performance under the Release.

<u>3.  Steele Breached the Release by Filing this Lawsuit.</u>

Steele breached the Release when she filed this lawsuit.  The Release plainly required Steele to "release, acquit and forever discharge" Menards "from any and all rights, claims, causes of actions, demands and damages of any kind" that "result[ed] [in] or related to personal injuries, emotional distress, loss of use of income, impairment to earning capacity or any other damage or expense incurred or sustained as a result of, or in any way related to" her January 2014 accident at the Menards at Easton Town Center.  (Ex. 1 to Hanna Aff. at ¶ 1).  This suit, which seeks damages for negligence stemming from that very accident, breaches the Release. Steele does not contend otherwise.

#### 4.  Menards Suffered Damages as a Result of Steele's Breach.

Defending against a lawsuit is rarely free.  By hailing Menards into court on the eve of the statute of limitations for her negligence claim, Steele caused damages to Menards, including all costs, expenses, and attorneys' fees required to defend against this action.  Steele does not contest Menards's damages; nor could she.  By signing and executing the Release, she expressly acknowledged that Menards would be damaged if she breached it.  (*Id.* at ¶ 4 ("I further understand and agree that the amount received in exchange for this Release . . . *is also accepted to avoid the uncertainty and expense in the commencement and/or delay of continuing litigation*." (emphasis added))).

Perhaps anticipating this result, the Release also requires Steele to indemnify and defend for any claims brought against Menards which relate to the released claims:

> I agree to indemnify and hold harmless [Menards] from any and all actions, claims, liens, or demands of any nature that are filed or will be filed against [it] that arise out of these alleged damages to myself, my heirs, assigns, agents or insurers, resulting or claimed to have resulted from the accident.

(*Id.* at ¶ 5).  Thus, Steele remains contractually bound to pay for Menards's costs of defense in this action.  *See Nottingdale Homeowners' Ass'n v. Darby*, 33 Ohio St. 3d 32, 33-36 (1987) (permitting parties to contractually agree to pay one another's attorneys' fees in any ensuing litigation); *see also New Market Acquisitions, Ltd. v. Powerhouse Gym*, 154 F. Supp. 2d 1213, 1227 (S.D. Ohio 2001).  Aside from the obvious imbalance that inheres in the corporation versus the individual, both parties enjoyed the benefit of being represented by counsel in the drafting and negotiation of the Release.  Hence, there was parity between the parties, at least with respect to equal representation in negotiating the release.  And Menards offered Steele one last chance to dismiss this lawsuit, thereby reducing any fees she might incur.  (*See* Ex. 3 to Hanna Aff.).  Steele, however, declined that offer and filed suit anyway.

Having established all elements of its breach-of-contract counterclaim beyond any genuine dispute of material fact, Menards is likewise entitled to judgment as a matter of law. Consequently, Steele's underlying negligence claim is barred by her enforceable settlement agreement with Menards.

### C. Menards Is Entitled to Damages.

As explained above, Menards remains entitled to damages, including all costs, expenses, and attorneys' fees required to defend against this action. At oral argument on February 2, 2017, counsel for Menards suggested that the company might be willing to waive any judgment in its favor as to damages in exchange for an agreement from Steele to waive any rights to appeal this Court's decision—thus concluding this lawsuit.

The Court will take counsel up on this offer before scheduling a damages hearing. Accordingly, the parties have thirty days from entry of this Opinion & Order—which imposes liability on Steele—to enter a stipulated agreement regarding a waiver of Menards's damages in exchange for an appellate waiver. If the parties are unable to reach such an agreement within thirty days, then the Court will be required to set a damages hearing.

### CONCLUSION

For these reasons, the Court **GRANTS** Menards's motion for summary judgment (Doc. 13) on its counterclaim for breach of contract as well as on Steele's underlying claim for negligence. The parties have thirty days to reach an agreement regarding a waiver of damages in exchange for an appellate waiver. Within that thirty-day window, Menards must tender to Steele the $2,500 owed to her under the July 2014 Release and which Steele returned to Menards, paving the way for this lawsuit.

**IT IS SO ORDERED.**

                                            **_/s/ Algenon L. Marbley_**
                                            **ALGENON L. MARBLEY**
                                            **UNITED STATES DISTRICT JUDGE**

**DATED:  February 7, 2017**